1   Brian Best

2   PO Box 10827, S. Lake Tahoe, CA, 96158

3   (530) 318-3158

4   brianbest@zoho.com

5   Plaintiff

6                    **UNITED STATES DISTRICT COURT**

7                   **NORTHERN DISTRICT OF CALIFORNIA**

8                              Oakland

9                                      )
                                       )
10  Brian Best                         )   Case No. CV-19-2252-YGR
                                       )
11              Plaintiff,             )   Amended Complaint
                                       )
12      vs.                            )   Date: 8/13/2019
                                       )
13  "John Doe" (Sheriffs Deputy),      )
                                       )
14  the Sonoma County Sheriffs Department,  )
                                       )
15  the Sonoma County Board of Supervisors,  )
                                       )
16  the Sonoma County District Attorney's Office  )
                                       )
17  _____Defendants._____  )

18

19          Please note that Plaintiff has divided up some sections into two parts – part 1 will consist

20  of events relevant to the assault and battery element of this case, and part 2 will consist of the

21  events relevant to the negligence element of this case.

22

23                            **1. PARTIES**

24          Plaintiff:

Name:       Brian Best

Address:    P.O. Box 10827, S. Lake Tahoe, CA, 96158

Telephone:  (530) 318-3158

    Defendants:

Defendant 1:

Name: A "John Doe", a Sonoma County Sheriff Deputy

Defendant 2:

Name:       The Sonoma County Sheriffs Department

Address:    2796 Ventura Ave, Santa Rosa, CA 95403

Telephone:  (707) 565-2511

Defendant 3:

Name:       The Sonoma County Board of Supervisors

Address:    575 Administration Drive

Telephone:  (707) 565-2241

Defendant 4:

Name:       The Sonoma County District Attorney's Office

Address:    600 Administration Drive, Room 212 J

Telephone:  (707) 565-2311

## 2. JURISDICTION

My case belongs in federal court under federal question jurisdiction because it involves a federal law or right.

The federal laws and rights involved are:

(1) U.S.C. Fourth Amendment

(2) U.S.C. Eighth Amendment

(3) U.S.C. Fourteenth Amendment

Also: Aggravated Assault and Battery, Excessive Force, Negligence, and Torture

### 3. VENUE

The Venue is appropriate in this Court because the incident happened in this district, the defendants are located in this district, and I am suing a government agency of the county.

### 4. INTRADISTRICT ASSIGNMENT

Because this lawsuit arose in Sonoma County, it should be assigned to the San Francisco / Oakland Division of this Court.

### 5. STATEMENT OF FACTS – PART 1

I had been driving for approximately four and a half hours. I was moving from South Lake Tahoe, to Sonoma County. I was on my way to Sugar Loaf Campground. I needed to use a restroom, but was waiting until I saw some kind of store off the freeway. My GPS unit that my parents had loaned me stopped working. I decided to exit the freeway and find a place to park. I was headed North of US 101. I exited the freeway onto Santa Rosa Ave. I came immediately to the intersection of Roberts Lake Road, and saw no buildings around. I made a right hand turn onto Roberts Lake Road. I drove for about a mile with the freeway on my right, and a fence on the side of the road to my left, with no buildings around. I came to a shopping plaza, with a Mary's Pizza Shack, a shopping plaza, and what looked like a time share or apartment complex. It was approximately 10:15 to 10:20 PM. Everything looked closed.

1    Part of the parking lot was blocked off by a fence.  I parked in a corner, and walked

2  around the building, and peed in a bush behind a tree, in the dark, in a forested and well-covered

3  area.

4    There was a building under construction nearby.  There was a lake within approximately

5  30 to 50 feet.  The moon was out, and I decided to take a break from driving and walk around a

6  bit.  I went and looked at the building under construction.  It was a restaurant (I found out later it

7  was "Bear Republic Brewing Co."), and had a big open kitchen area open to view from the

8  dining area, and I found it aesthetically and architecturally interesting.  There were no signs, and

9  the area was not blocked off by a fence or anything.

10    I left the area, (1) without taking anything or damaging anything, and (2) was walking

11  back in the directions towards my car.  The arresting officer should confirm those two facts.

12    The construction area had had a big light inside, and a surveillance camera, and 2

13  Rohnert Park Police officers were hiding behind a bush, and when I walked forward, they came

14  out from behind the bush, pointed weapons at me, and told me to get on the ground.  I was

15  absolutely cooperative, and the arresting officer confirmed this later.  I was handcuffed.  The

16  arresting officer asked me what I was doing, and when I told him, he said, "I was not born

17  yesterday", and stated he did not believe me.  I was escorted into the back of the police car.  He

18  had said he was charging me with burglary.  He left.

19    There were other officers there, and I asked to speak to them, and explained, and they

20  said I would have to talk to the arresting officer.  When the arresting officer came back, and was

21  willing to hear me out, he said "I have already filled out the paperwork", and "I would get in

22  trouble if I changed it now."

23    I was charged with felony burglary, and taken to the jail in Santa Rosa, and booked in.

24

1    The Santa Rosa Jail has a "waiting area" for inmates - a big open area with a TV,

2  approximately 6-7 rows of chairs with an aisle down the middle, with approximately 5 chairs on

3  each side of the aisle per row.  There was an open drinking fountain nearby.  I was sitting in the

4  waiting area, and I was called on the loud speaker to the intake desks, and I was asked intake

5  questions.

6    In response to the question "Are you on probation?", I responded, verbatim, "I would

7  prefer not to answer that without an attorney present."

8    The deputy responded, brusquely, verbatim, "Fine.  I'm done.  Go back to the waiting

9  area."

10    I looked up, said "Okay", got up, and started walking back to the waiting area.

11    When I was halfway to the waiting area, the deputy shouted out, "Actually you know

12  what, go to the holding cell."  (I can't remember if she said "Actually you know what, go to the

13  holding cell", or "Actually you know what, I change my mind, go to the holding cell.")

14    I stopped.  I turned calmly, saw that the deputy had gotten up and walked around the

15  intake desk, and saw that the deputy at the desk to her left had also gotten up and was following

16  her.

17    I did not move any part of my body.  They did not stop walking towards me or hesitate.

18  The first deputy, who had asked the intake questions, and who had interacted with me previously

19  as described, hugged the wall to her right.  I did not say anything.

20    The first deputy walked around me.  I did not move at all.  I had turned when she had

21  shouted out to me that I was to go to the holding cell.

22    *The first deputy grabbed my right arm from behind me suddenly, with both her hands,

23  and started to pull my arm, in a way in which could have eventually broken my arm or dislocated

24  my shoulder.

1    *I want to be up front about the fact that I am subject to the universal laws of physics,

2    and do have physiological reflexes.  I did retract and untwist my arm on reflex after she walked

3    behind me, and grabbed my arm suddenly from behind, and yanked and twisted my arm. But I

4    did not extend any part of my body towards any of the deputies at any time.  The holding cell

5    was in front of me and slightly to my left.  The deputy had walked around the side of me

6    opposite the holding cell, and had grabbed my arm while she was on the side of me opposite of

7    the holding cell.

8    After an estimated 0.3 to 0.8 seconds, I mentally processed what was happening, and

9    totally relaxed.  I said "Okay," and for a moment, the deputy stood there holding my right arm,

10   and I was just standing there with her holding my right arm, and I had my left arm relaxed at my

11   side.  I had turned slightly to my right by about 30 degrees from my orientation prior to this

12   interaction.

13   The second deputy had walked up behind me, and he put his right arm around my neck,

14   his left hand on the back of my head, and leaned me backward, while the first deputy held my

15   right arm.  This is what an Internal Affairs officer later called a "Carotid Hold" in law

16   enforcement terminology, but is also called a "Rear Naked Choke" in martial arts.  The second

17   officer forced me into unconsciousness.  And the last thing I remember was being leaned

18   backward, and having the thought that the best thing to do to resolve the situation would be to

19   relax and demonstrate that I am not a threat.  I believe I tried to "tap out" by tapping my left

20   thigh with my left hand.

21   When I regained consciousness, I was on the ground, on my stomach, face down.  The

22   second officer still had his right arm around my neck.  His right knee was on my back right on

23   top of my left kidney area on my back, and he had I would estimate 80-90% of his weight on that

24   knee.

1        My head was turned to the left.

2        The first officer still had my right arm grasped with both hands.

3        I could not breathe.

4        The first thing I remember is yelling "Ahh" during a moment when I could barely

5    breathe, and being instinctively afraid for my life.  I saw that the second officer had shifted his

6    left hand from the back of my head to against his right fist.  He was actively crushing my neck

7    between his right arm with great force and effort.

8        This happened right underneath a surveillance camera, which I brought up afterwards, but

9    I was told continuously that the surveillance system does not record.

10        Several other deputies had come out.  The "second deputy" (the "John Doe" defendant)

11    then said "Give me your arm."

12        My left arm was pinned under the second deputy's left leg, under his shin, adjacent to his

13    ankle.  He repeated his statement to give him my arm.  I could not breathe or speak at that point

14    because of the choke hold.

15        One of the other deputies had come over, to the side the second deputy was on -- my left,

16    and pointed at my arm and said "I think his arm is under..." and pointed at my arm underneath

17    the second deputy's leg.

18        I believe this lasted 4 to 6 minutes, from the time I regained consciousness, until the

19    second deputy stopped crushing my neck, and stopped crushing my kidney with his knee with

20    most of his weight behind it.  I was handcuffed, picked up, and carried into the holding cell, and

21    placed on my knees on the bench in the cell face against the wall, all the way against the wall.

22        Another deputy had a tazer out, and was pointing it at me.  The other deputies left the cell

23    except her, and she said "If you move, you will be tazered, do you understand?"  And I said

24    calmly "Yes.  I don't want any problems."  And she left the cell and locked the door.

*Amended Complaint*                          *CV-19-2252-YGR*
*Page 7 of 25*

I sustained significant injury to my kidney, and a muscle in my neck was sprained.  My wrist was hurt but not significantly injured.

The deputy who had assaulted me was grinning hugely continuously until he and the first deputy both left about 15 minutes later.  He showed two other officers something on the computer and laughed, and seemed absolutely delighted.

I asked another deputy to identify the deputy who had assaulted me and the deputy refused to do so.

I had asked for paper and pen and was given them.  I wrote the exact events that happened on the piece of paper and gave them to the deputy.  I had slipped the paper under the door.  The deputy stood there for approximately 30 seconds and read what I had written on the paper -- which was just a description of the events.  He then refused to take the paper and left it on the floor, and it was picked up by an inmate janitor later and thrown in the garbage can that he had with him.

I bailed out.

The D.A. decided not to file charges.

I called the Sheriffs office within the next day or two, and requested, "I would like to make an official complaint in writing."  The phone attendant transferred me.  I repeated my request, to make an "official complaint," "in writing", and the officer replied "We don't do that.  Why don't you tell me what happened?"  So I did.  He ended the conversation.  No record was made by the Sheriffs Department of this call.

The incident happened right underneath a surveillance camera, but apparently the surveillance system in the jail does not record.

Much has happened since then interacting with various people who were representing the government, and I am continuing to interact with government agencies and officials.

I sent the County Supervisors Office, and the Sheriffs, a complaint, and it had a drawing of the orientation of my body after I was on the ground face down on my stomach, showing that the female officer was on the side of me opposite of the holding cell, and showing the path she took around me, opposite the holding cell.

*AMENDMENT:

Plaintiff would like to explain in greater detail how the first deputy grabbed Plaintiff's arm and what the first deputy did after that, and the effect this had on Plaintiff, in more detail, for the sake of clarity and more understanding of what happened, and to avoid potential misinterpretation.

Plaintiff alleged there were two deputies involved in the altercation.  The first deputy, walked around plaintiff, and grabbed Plaintiff's right wrist/forearm area of Plaintiff's right arm. Firstly, Plaintiff would like to emphasize that this deputy had walked around Plaintiff on the opposite side of the holding cells, and that this should show that the deputy walked around plaintiff with the intention of taking plaintiff's arm.

Plaintiff has realized since his original complaint that it is likely that the first deputy's thought process in taking Plaintiff's arm could have been to put Plaintiff's right arm simply behind plaintiff's back in a standard 'control' technique, which would not cause pain or any serious discomfort.

However, Plaintiff would like to describe in more detail what the deputy did, which was improper.  What the deputy actually did, after taking Plaintiff's right arm by his wrist/forearm, with, initially her right hand, was twist plaintiff's arm so that (using Plaintiff's thumb as a reference point) his thumb rotated around the inside until Plaintiff's thumb would be pointing behind Plaintiff.  The deputy then stretched out / straightened Plaintiff's right arm behind him, and lifted up until it was about at the deputy's shoulder level.

The effect this had on Plaintiff was both a physical and biomechanical effect, and a physiological reflexive effect. The effect was not of Plaintiff's volition, and should be considered to have been caused wholly by the deputy, as it was a predictable and causal effect of her actions. Plaintiff retracted and untwisted his right arm, and plaintiff's body was rotated by the deputy's action, at the very least in the majority. Plaintiff pivoted on his heels without moving his body significantly, just so that his arm untwisted. Plaintiff did not extend any part of his body toward the deputy at all. Plaintiff did not move his left arm at all. Also the deputy, who had walked around behind plaintiff, took Plaintiff's arm while she was on the opposite side of the holding cells, did continue to circle a bit around Plaintiff during this time period, so that she ended up more in front of plaintiff.

Plaintiff would much rather explain this in person, because it is difficult to describe, and Plaintiff would like to be able see that the Court understands this, and feels an in person hearing would be most appropriate.

Plaintiff then completely relaxed and said "Okay". Then the second deputy put his arm around Plaintiff's neck.

## 6. STATEMENT OF FACTS – PART 2

With regard to the members of the County Supervisors office and/or the Risk Management Office (Janell Crane, Lynda Hopkins, and Amie Windsor), Plaintiff acknowledges that they should and do have some discretion to ignore people under certain circumstances. But this also must be weighed against their duties and responsibilities to the public. When a citizen has a valid issue with Government, it is the function, duty, and responsibility of the District County Supervisor (Lynda Hopkins, and her field agent, Amie Windsor) to be a liaison between individuals of the public and the various government agencies. Ms. Hopkins directly denied having responsibility in this regard (wrote via email that if the Plaintiff believes if she has

1    responsibility, to quote what documents say so, and then ignored Plaintiff from then on).   Janell

2    Crane should have a responsibility to reply to members of the public who have legitimate

3    business with her.

4         Janell Crane, as well as the Sheriffs' Internal Affairs Department (Sgt. Andy Cash, and Lt.

5    Eddie Engram) have demonstrated an entrenched culture of dishonesty and irresponsibility

6    prioritized over their public duties.  This "policy" denied Plaintiff's right to equal treatment under

7    the law under the fourteenth amendment of the US Constitution; his right to justice and

8    protection as a victim of a rather extremely serious set of crimes.

9         A lot happened after Plaintiff initially contacted the County, and Plaintiff corresponded

10   with around twelve different County employees, including the Sheriffs, DA's office, the Board of

11   Supervisors, and "IOLERO".  The County Board of Supervisors Office's agency, IOLERO's

12   director Jerry Threet resigning, after promising to "pay close attention to [Plaintiff's] case", and

13   after criticizing the Sheriffs Department publicly for the internal investigations practices being

14   biased and unfair, and, because of his resignation, an integral part of the Board of Supervisors'

15   claim evaluation process was delayed, and is now pending evaluation by the new IOLERO

16   director.

17        There are three other events that occurred that Plaintiff would like to describe. (1) an

18   event with Janell Crane, of the County Board of Supervisors office, (2) two events with Sgt.

19   Cash, and (3) an event with Lt. Eddie Engram.

20        The event with Janell Crane would start with Plaintiff calling the Board of Supervisors

21   office, and being directed by Lisa Sharp to communicate with various people, eventually being

22   directed to Amie Windsor and Lynda Hopkins, because Plaintiff had asked to speak to someone

23   before filing his claim.  Ms. Hopkins forwarded Plaintiff to Janell Crane.  Janell Crane had

24   Plaintiff meet with Kristie Schultz, which Plaintiff did.  At this point in time, it was about eight

weeks to three months after Plaintiff had met with Sgt. Cash of the Internal Affairs department for that interview.  After the meeting with Ms. Schultz, Plaintiff emailed her to let her know he was filing his claim, and she replied that she would keep an eye out for it.  Only about three days after filing his claim, Plaintiff received an email from the Sheriffs department notifying him that they had exonerated both officers.  Plaintiff immediately emailed Ms. Schultz, asking for the claim to be put on hold.  Ms. Schultz never replied.  Three business days *after* Plaintiff emailed Ms. Schultz to ask for the claim to be put on hold, Janell Crane postmarked a letter to Plaintiff, rejecting his claim.

Plaintiff emailed Ms. Crane asking if she had discussed the matter with Ms. Schultz, and asking why the claim was not put on hold.  Ms. Crane replied without acknowledging or answering either question, but inviting Plaintiff in for a meeting, and saying "I receive your request for the claim to be put on hold".  Plaintiff replied that he would be willing to come in for a meeting, asking what Ms. Crane's goal of meeting would be, and complaining about the results of the investigation.  Ms. Crane replied "Your claim has been rejected ... My offer to meet was not for any goal on my part but to be responsive to your request."  Ms. Crane did not reply to any emails after that.

Regarding the events with Sgt. Cash, firstly, Plaintiff would like to describe part of the events regarding his interview with Sgt. Cash of Internal Affairs.  To summarize, Sgt. Cash was extremely biased, overly focused on slanting the situation to justify the actions of "John Doe", repeatedly asked Plaintiff questions like if Plaintiff was angry, without any reason to think Plaintiff had been.  "You must have been aggravated."  "I would have punched them!"  etc. Upon receiving no confirmation that Plaintiff was angry b*efore* the incident occurred, Sgt. Cash shifted focus to Plaintiff's emotional state *after* the incident took place.  And upon receiving confirmation that Plaintiff "may have possibly" been upset, and ("may have possibly", or maybe

not) used a swear word, very specifically *after* the incident occurred, concluded the meeting. Sgt. Cash recorded this meeting with a voice recorder.

Secondly, Plaintiff had called the Sonoma County District Attorney's Office, and spoke with Officer Selly (note the spelling might be incorrect), of the investigations department. Officer Selly told plaintiff that sometimes a different department, such as the police, will do an independent investigation about an incident.  Plaintiff called  the Rohnert Park Police Department, and explained the situation to the phone attendent, and phone attendant offered to call the Sonoma County Sheriffs department, with Plaintiff on hold, so Plaintiff agreed.  After a few minutes, Plaintiff was transferred into the call, and spoke with Deputy Hunt, and reported the incident, and was asked objective questions by Deputy Hunty about the incident.  The next day, Plaintiff was called at exactly 7:00 AM by Sgt. Cash.  Sgt. Cash was frusterated, told Plaintiff that Plaintiff "had spoken with Janell Crane", said something Plaintiff remembers as implying that people lose their jobs over things like that, and told Plaintiff more than once, "Sue us."  Plaintiff said very little, told Sgt. Cash that he doesn't want to be adversarial with him, and the call lasted about ten to fifteen minutes.

Plaintiff also had a conversation with Lt. Engram, over the phone.  Here Plaintiff will leave out some details of this conversation which may be irrelevant, but may prove relevant later, for the sake of being as succinct as possible.  Plaintiff will email himself a copy of these notes, however, so it can be shown that Plaintiff has not changed them later – since this was a conversation over the phone and there is little hard proof of what was said, but would have good faith that his notes won't be disputed.

What is relevant now of that conversation is that Lt. Engram was the one who signed off on the exoneration of the officers, stated that he was adequately familiar with the case to answer Plaintiff's questions, declined to dispute the fact that Plaintiff was put in a non-standard choke

hold for 4-6 minutes after Plaintiff regained consciousness, when asked, and declined to dispute any other part of Plaintiff's allegations. He instructed Plaintiff to contact Sgt. Cash after April 1st 2019. Plaintiff had a lot of other deadlines and responsibilities that month, though, related to this case, such as getting this civil complaint in before its deadline, and was unable, and unsure as to how exactly, to follow up on Lt. Engram's offer, at the time. The Sheriffs department has since retracted the offer to allow Plaintiff to contact them and to re-evaluate the incident, in light of the two small but significant amendments Plaintiff has made ("John Doe" shifted his hand from the back of Plaintiff's head to against his other fist, and the additional details regarding how "Jane Doe" grabbed Plaintiff's arm in what was not a standard technique, or a simple control technique), which were, as apparent, a cause of misinterpretation.

The assault and battery took place right underneath a camera, in the jail, and at least three other deputies witnessed the latter part of the incident. However, the Sheriffs have stated that the camera did not have recording capability.

The Sonoma County District Attorney's office has refused to accept a complaint about the incident from Plaintiff. They refer Plaintiff to the California Attorney General's office (CA AOG). The CA AOG has stated clearly that, as the authority for the California local DA's offices, they set the policy that the local DA's offices are supposed to take complaints from citizens in cases where a citizen is a victim of a law enforcement officer comitting a crime against them, and the agency's internal affairs department does not investigate or act impartially. And the CA AOG refers Plaintiff back to the local DA. The Sonoma County DA's office (Officer Selly, etc.), upon being told this, still refused to accept a complaint from Plaintiff. The CA AOG requires Plaintiff to send them a complaint, and for them to respond.

### 7. CLAIMS – PART 1

1. The Cruel and Unusual Punishments Clause of the Eighth Amendment

2. The Fourth Amendment Prohibiting Unreasonable or Excessive Use of Force

3. 42 U.S.Code § 1983 Civil Rights

4. California Penal Code § 149, Unlawful Beating by a Public Officer

5. California Penal Code § 206, Torture

6. California Penal Code § 243(d), Aggravated Battery

      The first question to ask is if punishing me for saying "I'd prefer not to answer that question without an attorney present" by sending me to a holding cell instead of the waiting area with the TV and open area was arbitrary.  Obviously in the situation I described, it was meant as punishment.  The answer to whether it was arbitrary is yes because I do indisputably have the right to consult an attorney before answering that specific question.  Even if I didn't, my intention was only to state my preference - my intention was not to outright refuse, and this was reflected in the technical meaning of the words I used.

      Secondly, the first police officer, who walked behind me, and then unexpectedly grabbed and yanked my right arm by my wrist.  I should have been given reasonable chance to follow her directions before she used physical force, which I was not.  If I had been given a chance to follow her directions I would have done so on my own.

      Thirdly, the second officer, who intentionally and maliciously and continuously inflicted serious pain and injury to me does not have the right to do so; his actions do not fulfill any exceptions to the law against assault and battery.  Even if I was mistakenly perceived (or more likely, lied about) as being non-compliant, physically resistant, or even combative, once I had been forced into unconsciousness, put on the ground, face down, with my right arm restrained by the first officer, and my left arm pinned under his left leg, even if he somehow negligently and obliviously did not realize my left arm was pinned under his leg while he was assaulting me

(which I would believe to be a lie), there was no reason to continue to inflict pain and injury and risk my death by violently crushing my neck for a long period of time, as well as pain and injury (and risk of serious injury) to my kidney by driving his knee into it.  Even after another officer notified him that my left arm was pinned under his leg, he continued to inflict pain and injury on me by squeezing my neck with his forearm hard enough to sprain my neck, and put a large percentage of his weight on his knee on top of my left kidney.

There is no possible way a person could "accidentally" drive their knee into a person's kidney area on their back "just by coincidence".  It is completely unreasonable to consider that the truth of what happened.  It was without any doubt whatsoever intentional and with the intention to cause pain and injury.  Strangling someone and squeezing their neck hard enough to sprain their neck for such a long period of time is even more obviously intentional, grievous, and unnecessary.

The continual intention of the second officer to inflict pain and injury on me went beyond the intention of restraint, and continued after I was restrained, and this constitutes assault as well as aggravated battery.  In fact I was never not restrained, since I was readily and immediately compliant, within the limits of the universal laws of physics, and physiology, with every command and instruction.

Also, I had told the first officer "okay" and was not moving, when the second officer put his right arm around my neck and then forced me into unconsciousness.  I also never extended any part of my body towards any of the deputies at any point in time.

It is also negligent, and suspicious, for the Sheriffs Department to install a surveillance system in the jail, and choose to not record the video, or choose to not install recording capability.

The force used for the length of time it was used for was easily potentially lethal force. The "Carotid Hold", or "Rear Naked Choke" has killed people in "30 to 40 seconds" (Stephen A.

Arceneaux III of Destrehan, Louisiana).  I do not know how long the hold was applied to me for, before I regained consciousness, at which point, the officer had shifted his left hand from the back of my head to against his right fist and continued to crush my neck with intense effort for another 4 to 6 minutes.

I should not have to have crushed vertebrae, a crushed windpipe, or ruptured kidney before I am entitled to "the equal protection of the laws" (as guaranteed by the U.S. Constitution, 14th amendment).  Also just because I happened to not suffer those injuries does not mean there was not serious and significant risk of them happening.

When the first officer randomly grabbed my right arm from behind and yanked my arm, I would estimate that 85% of any so-called "resistance" that was encountered was due to universal laws of physics, and would have been equal to that encountered when yanking an inanimate object.  People can not be punished either for being subject to universal laws of physics, or for the simplest and most basic form of physiological reflexes.  Again, I never extended any part of my body towards any of the deputies.  All I did was slightly retract and untwist my arm, because what she was doing could have (eventually) dislocated my shoulder, or broken my arm.  I'm not saying she was yanking hard enough to do so.  I'm just trying to explain the physiological reflex, and the way that she was yanking / twisting my arm.  But likewise, I moved very little.  These can not reasonably be named "resistance" in the legal sense of the word, or be considered mutually exclusive to complete compliance.  In this situation, I should be considered to have been completely compliant, because I was.  Again, I quickly processed mentally the situation, and totally relaxed, and said "Okay", before the second officer put me in a "carotid hold".  After he put me in the carotid hold, I did not resist or anything.  I was completely relaxed and did not move at all.

I have broken my arm and had 2 concussions skiing, and my ankle once playing soccer and once snowboarding.  The pain in my kidney was much worse and the pain lasted much, much longer than any of these accidents.  It was about as disabling afterwards as the broken ankle, and more disabling than the broken arm.

The fact that the John Doe assaulted me in ways which were blatantly not conspicuous, but also blatantly very painful should be considered worse, not better -- meaning, it should be evidence of malicious intention.

From what I've read of kidney trauma, just because no trace of blood was found in my urine, it still could have been up to level three kidney trauma.  I did fully recover after approximately 4-5 weeks.


REFERENCES:

1. The National Institute of Justice, the Research, Development, and Evaluation Agency of the U.S. Department of Justice.  "The International Association of Chiefs of Police has described use of force as the 'amount of effort required by police to compel compliance by an unwilling subject.'"

2. Id.  "Law enforcement officers should use only the amount of force necessary to mitigate an incident, make an arrest, or protect themselves or others from harm."

3. Id.  "An officer's goal is to regain control as soon as possible while protecting the community. Use of force is an officer's last option — a necessary course of action to restore safety in a community when other practices are ineffective."

4. Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal 1995), 102.  "[T]here is simply no place for abuse and mistreatment, even in the darkest of jailhouse cells."

1       5. Madrid v. Gomez, infra, 889 F. Supp. 1146, 48.  "The court finds that supervision of

2   the use of non-lethal force at Pelican Bay is strikingly deficient") and Id at 53 ("It is clear to the

3   Court that while the IAD goes through the necessary motions, it is invariably a counterfeit

4   investigation pursued with one outcome in mind:  to avoid finding officer misconduct as often as

5   possible.  As described below, not only are all presumptions in favor of the officer, but evidence

6   is routinely strained, twisted or ignored to reach the desired result."  -

7       6. Turner v. Safley (1987) 482 U.S. 78, 89 [upholding restrictions on mail between

8   inmates at different institutions but striking down a restriction on inmates getting married while

9   in prison] ("when a prison regulation impinges on inmates' constitutional rights, the regulation is

10  valid if it is reasonably related to legitimate penological interests")  In making such a

11  determination, the court can look to whether a logical connection exists between the policy and

12  goal; whether the objective is legitimate and neutral; whether other means exist to accomplish

13  the goal; the "impact accommodation of the asserted constitutional right will have on guards and

14  other inmates, and on the allocation of prison resources generally;" and whether the policy seems

15  to be an "exaggerated" response to the problem.

16      7. Scher v. Engelke (8th Cir. 1991) 943 F.2d 921 ("This is a clear case of a prisoner who

17  was subjected to retaliatory cell searches and conduct violations for bringing the illicit conduct of

18  a prison guard to the attention of prison officials.  The lawmaking retaliation for the exercise of a

19  constitutional right actionable under 1983 has been established for some time and an objectively

20  reasonable official could not fail to know of it.")

21      8. Hudson v. McMillan (1991) 503 U.S. 1, 7 ("In recognition of these similarities, we

22  hold that, whenever prison officials stand accused of using excessive physical force in violation

23  of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley:

24

whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.")  Referring to Whitley v. Albers (1986) 475 U.S. 312.

9. Madrid v. Gomez, infra, 889 F. Supp. 1146, 25.  In the case of Inmate Castillo, who was beaten unconscious for refusing to return his tray, the judge came to the "inescapable conclusion that Castillo was subjected to the use of excessive force that was imposed, not in a good faith effort to restore order or maintain prison security, but maliciously for the purpose of causing pain and inflicting punishment."

10. Id at 30.  In the case of Inmate Dortch, who was scalded with hot water: "It is nonetheless clear, from all of the surrounding circumstances, that Dortch was given the bath primarily as a punitive measure and for the purpose of inflicting some degree of pain, in retaliation for, and perhaps out of frustration with, his prior offensive conduct."

11. Tennessee v. Garner, 471 U. S. 1. "Constitutional right to be free from excessive force during a seizure".

12. U.S. Constitution, Amendment 14.  "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

13. Graham v. Conner, 490 U.S. (1989)

14. Id at 396 (citing Tennessee v. Garner, 471 U.S. 1, 8–9 (1985)).  The 'Graham test' considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and  whether he is actively resisting arrest or attempting to evade arrest by flight."

15.  People v. Pre (2004) 117 Cal. App.4th 413, 419. ("Section 206 does not require permanent, disabling, or disfiguring injuries; 'Section 206 only requires 'great bodily injury as

1   defined in Section 12022.7'.... 'Abrasions, lacerations and bruising can constitute great bodily

2   injury.'")

3        16. Id at 420.  "[S]everity of a victim's wounds is not necessarily determinative of intent

4   to torture" since "[s]evere wounds may be inflicted as a result of an explosion of violence

5   [citations] or an 'act of animal fury' " rather than an intent to inflict pain for revenge, extortion,

6   persuasion, or other sadistic purpose."

7

8                                   **8. CLAIMS – PART 2**

9        Plaintiff has rights put forth by the California Victims Bill of Rights, including the right

10   to reimbursement for reckless actions by County employees causing injury, which includes the

11   extremely serious violent crimes committed against him by a County employee.  Plaintiff is

12   asking for those "rights" to be honored in this situation.

13        Plaintiff would argue also that the fourteenth amendment guarantees "equal treatment

14   under the law".

15        The principle of "equal treatment under the law" is known as isonomy, and was founded

16   in Ancient Greece. "The rule of the people has the fairest name of all, isonomy (also correctly

17   translated as democracy), and does none of the things that a monarch does. Power is held

18   accountable, and deliberation is conducted in public" (Herodotus).  To put this in the context of

19   the US constitution, this is a principle to distinguish democracy, and the rights of the people,

20   from monarchy, and most likely the powers of government, which was relevant at the time the

21   US Constitution was written.

22                                              -

23        Plaintiff wishes to allege that members of the County abused their position to neglect

24   their job duties in order to consciously cause a real, potentially undisputed-by-witnesses, factual,

*Amended Complaint*                          *CV-19-2252-YGR*
*Page 21 of 25*

incident where very serious crimes were committed by "John Doe" to go unprosecuted, with the intent for it to wrongfully go unprosecuted, and did so for the ulterior motive to avoid civil liability.  Plaintiff would charge several individuals representing the County with Negligence.

Plaintiff's civil complaint most likely cannot be considered a criminal complaint, even though he alleges serious crimes, and "John Doe" would, at this point, likely be protected by the statute of limitations from the charges of assault and battery, directly because of the other defendants' negligence, and that the defendants did so with the motive of escaping civil liability. Even though Plaintiff has reported the incident to the Sheriffs in general, IOLERO, the Sheriff's Internal Affairs Department, the County District Attorney's office (four to six times, who referred plaintiff to the Attorney General), and the California Attorney General.  Plaintiff spoke to representatives of the Attorney General four to five times, who said explicitly that it is their policy, as the authority for the Sonoma DA, that the County District Attorney is supposed to take a report from a victim, in a case like this, and referred Plaintiff back to the local DA three to four times before finally sending Plaintiff a complaint form.

Plaintiff would ask for injunctive relief in the form of "a remedy".  Plaintiff would propose extending the statutes of limitations, under these circumstances, and Plaintiff would argue that this is reasonable, in this situation.

Plaintiff cites the personal danger of a society where sadistic criminals are protected by individuals who abuse their positions to escape civil liability.

Plaintiff would also like to point out that members of the County could objectively be considered under normal circumstances "Accessories-After-the-Fact" (18 U.S. Code § 3. Accessory after the fact, and California Penal Code 32 PC)  in this situation, which would be extremely serious, given the seriousness of the crimes that occurred, but acknowledges that because they have discretion, and some immunities within the scope of their duties, that this would be, at best, in the light most favorable to the Plaintiff, a gray area. As plaintiff mentioned also elsewhere in this letter, it is apparently the County's policy to commit this federal crime, and it violates Plaintiffs rights under the fourteenth amendment of the US Constitution.

Also to blame is the inadequacy and unfairness of the government structure dictating that both the perpetrator of the criminals acts, and the prosecutor of criminals, and enforcer of law and apprehender of criminals, all be considered the same entity, in terms of civil liability, and this plain conflict of interest's interference with the interest of justice, and the duties of the Sheriff's department, and District Attorney's office.

Criminals employed by the government should not be granted such immense and preemptive and preexisting aid with public funds or immunities or be considered the same entity as the rest the government.

-

Plaintiff would name as additional defendants, Janell Crane, Lynda Hopkins, and Amie Windsor, of the Board of Supervisors, and, of the Sheriffs, Sgt. Andy Cash, and Lt. Eddie Engram. The situation with the Sheriffs is really a complicated matter. Plaintiff would prefer to sue the department as a whole, for the entrenched culture to direct its employees specifically to aim to deny liability as an integral function of their position, which is clearly not appropriate, and a clear cause of conflict of interest. It needs to be clarified to the Sheriffs department that denying liability is not a part of their job functions, and would be in conflict with their duties to the public. Plaintiff would allege violation of the fourteenth amendment of the US Constitution.

Most of the people of the government Plaintiff spoke with - Lisa Sharp, Beau Anderson, Melanie of IOLERO, Kristie Schultz, Deputy Hunt, as well as everyone Plaintiff spoke to from the Rohnert Park PD, as well as, to some extent, the people who simultaneously neglected their duties - treated Plaintiff respectfully, and Plaintiff cannot overstate his appreciation for that.

## 9. DAMAGES AND DEMAND FOR RELIEF

I sustained a serious injury to my kidneys. Although my kidneys were not ruptured, that does not mean much. I had pain in both kidneys which was excruciating for 8 hours after the

incident.  The pain was so bad that I could not walk upright or at a normal pace for a week.  And the pain lasted for a month.

A muscle in my neck was sprained, and my neck was in pain for about 6 days.  My wrist was hurt also.

By far the biggest damage was psychological.  I have intense fear of going outside.  I have intense anxiety being around people.  For example, I am so afraid of seeing my neighbors that I don't go outside to water my garden, even though my neighbors are really nice.  I have constant thoughts when I am outside of hypothetically being harassed by law enforcement.  I have unshakable fear of all human beings.

This is not a safe society to live in.  I was very clear with the County that my priorities were not monetary reimbursement but that the incident be addressed, and to resolve the incident in a reasonable manner.  They refused, and displayed a culture of dishonesty and irresponsibility at the upper levels of management (although the general workers were respectful and honest).  I would rather live in a society where I am not vulnerable to being almost killed or possibly killed by people who think they are above the law.  No amount of money can repair the damage.  The monetary reimbursement is not even a priority, but it is the only option in this venue.  I am asking for enough to start to approach to be able to maybe live a more safe life.

AMENDMENT:

1. Damages in being partially reimbursed for his time.  Plaintiff was a *victim* of an *extremely* serious, violent (and sadistic) crime.  Due to circumstances arising from the structure of government, this is Plaintiff's *only* option to stand up for himself, and that is Plaintiff's primary motivation.  As a victim of a crime, Plaintiff should not be limited to only this option, where plaintiff does not have a right to an advocate.

1       2. Reimbursement from the defendants for any necessary deposition fees, or at least for

2   the court to judge whether the deposition fees were a necessary and just aspect of Plaintiff's case,

3   and for the Court to judge whether or not Plaintiff should be awarded deposition fees at the

4   conclusion of the case, if they end up being required.  Plaintiff has put in effort into being

5   detailed, completely honest and forthright about the statement of facts, and, from statements

6   made by Lieutenant Engram, it seems that the facts of the incident are not disputed by the four

7   deputies who witnessed the event, or the two deputies involved in the altercation.  Plaintiff would

8   limit depositions to disputes as to the facts of the event made by the defendants, and any

9   necessary confirmation of the facts.

10      3. Punitive damages

11      Plaintiff is alleging damages in lost time and in quality of life, due to injury and trauma,

12  and negligence and crime resulting in society being unsafe, and the associated costs.

13

14                              **DEMAND FOR JURY TRIAL**

15

16      Plaintiff demands a jury trial on all issues:  Yes please.

17

18  Respectfully submitted,

19

20  Brian Best                                          Date:  August 13th, 2019

21

22  Signed:

23

24

*Amended Complaint*                 *CV-19-2252-YGR*
*Page 25 of 25*